Thank you, Your Honor. Good morning. My name is Eileen Gilbride, and I'm here on behalf of the plaintiff today, Scottsdale Insurance Company. I'm going to try to reserve a few minutes for rebuttal, and in the meantime, I'd like to try to make one or two points about each of the three claims in this case, and then a point about causation. First, on the contract claim, the record contains evidence from which a jury could certainly conclude that Market Finders had a duty, a contractual duty, which it breached, to underwrite the insurance and to protect Scottsdale's risk. We're not talking about an obligation that was expressed in the agency contract, and that's what Market Finders counsel keeps going back to, or their brief keeps going back to, is the express, no express agreement. We're talking about an obligation that was subsumed within Market Finders' job to take responsibility for properly underwriting this policy. You mean under the contract? Yes. Or by way of common law, or what? Subsumed under the contract, subsumed a tort duty and a fiduciary duty as well. Also under tort, you say? Yes. And I'll get to the tort issue in a minute. But here, Market Finders was tasked with the job of underwriting this policy. They had sole responsibility. They had independent judgment. It was their job. Market Finders was the one who solicited Scottsdale. It knew that Scottsdale had never written this kind of insurance before, and that Scottsdale was relying on its expertise in this particular area. You know what I don't understand? If Scottsdale had never written this kind of insurance, it had a great big book on how to write it, didn't it? It had a book. Where did that come from, if it never wrote this kind of insurance? Other types of insurance. It had never written these anesthesiologist policies, especially not in Indiana or Ohio before. But it had written medical malpractice policies? I'm not positive about that. I know that this was a completely new area for Scottsdale, and that's undisputed in the record. It means what? Anesthesiology? Yes. All right. At least. And in the obligation to underwrite this policy properly was subsumed the obligation to protect Scottsdale's risk. That's what an underwriter does. It examines the risk. It chooses the premium. It determines the premium accordingly. Here, Market Finders knew all about the Indiana Patients' Compensation Fund. It had worked with this fund before. The proposal required all Indiana practitioners to be in the fund. It clearly knew that that was a part of the proposal, and presumably the premium that Market Finders quoted was based upon all Indiana practitioners being placed in the fund. By the way, what you would make of the fact that for this particular anesthesiologist, you charged the Ohio premium rate, right? He was also practicing in Ohio, yes. But he got the higher premium. For the Ohio risk. And that's clear by seeing endorsement number five, which showed that he was charged the Ohio premium, and endorsement 13, which were issued on the same day, showing that the five Indiana practitioners were subject to the lower limits. What does that mean? That means, you know, no one involved in this transaction contemplated that there might be an insured who practiced in both Indiana and Ohio. Is that what it comes down to? It comes down to the fact that Market Finders did not check to see when ACT, which is the insured, told its broker to take Dr. Dinius off the limited endorsement, and the broker told Market Finders to do that. Which is the limited? Indiana? Indiana, yes, the 250. Go ahead. Market Finders didn't act as Scottsdale's underwriter. It was acting more like the insurance agent in saying, okay, let's just take this off, without asking why, without getting an additional premium. Taking him off of that endorsement and not putting him in the fund increased Scottsdale's risk. If you had known, if Scottsdale had known, or Market Finders had known that he had practiced in Indiana in the past for a period that was still covered, then you would have charged him both the Indiana and the Ohio premiums? Because by the time that this contract was actually signed, he was exclusively practicing in Ohio. The problem was that he had previously practiced in Indiana, and that's when the incident had occurred. That's correct. He still had some liability that sort of related back to his Indiana practice. Would you charge him both premiums? Because it was a claims-made policy, I don't know how much premium would have been charged since I'm not an underwriter. However, certainly the premium that was charged him was the same, in the same range, as the other Ohio practitioners. And I think you need to look closely at Endorsement 13, because what it says is these practitioners, including Dr. Dinius, will be subject to only the $250,000 cap, except, and there's a line below that says, except for practice that arises out of Ohio, in which case he gets the higher 5 million limits. Whose job was it to assess the application form for insurance? It strikes me as quite glaring that Dr. Dinius never answered question number 22. I asked that question also. And here's he did answer that question, number 22. It's blank. In a different spot, it's not blank. I'm looking, I guess, at page 302. It's got so many page numbers on it, I'm not sure what it's page 3020. But the question on the application is, are you aware of any acts, errors, omissions, or circumstances which may result in a malpractice claim or suit being made or brought against you? And there's a yes and a no, and neither one is checked. And then it says, if yes, complete, you know, another form, which ---- I saw that, too, Your Honor. But then in a different spot, it shows that he did answer that question. But in any event ---- Where does he answer that? I'll have to go back and look at it. When you say different spot, you mean not in this application? It is in ---- I believe it's in the notice of claim where he fills out the incident report or ---- I have to go back and look at that. And I will get up on rebuttal. When would that have been submitted to Market Finders? That was not submitted until after the binder already issued. They didn't require applications until 30 days after the binder. And when they got the applications, they didn't even look at it. That's why ---- I guess that's my question. It seems like there was ---- one could view the absence of following up on this issue, regardless of whether that question was answered here or somewhere else. It struck me as that a red flag should have gone up to someone. And the question is, who is the someone? Right. And the someone is the underwriter, the group or the person or the entity that has responsibility. Would this have gone to HIS first? Yes. And they would have transmitted to Market Finders? Yes, exactly. Did it ever find its way to Scottsdale? This being the application? Yes. Well after the fact, way after the fact. After the insurance was already issued? Yes. Scottsdale didn't issue the policy until December. And it's the ---- just a moment. It's the underwriter's responsibility to assess the risk. Now, their own expert testified that no one underwrote this insurance. No one did. And so even if, you know, even if you're stuck on the whole duty and issue of the contract, the record is undisputed that Market Finders had the sole responsibility and had to use its independent judgment to underwrite the policy, and no one did. Let me go back to the application just for one moment. Remember that this is a claims-made policy. Now, the insurance that was in effect at the time of the incident was not Scottsdale's insurance. Scottsdale, Dr. Dinius didn't even know that Scottsdale existed at this point because he had CNA insurance at that time. Yes, he does disclose that. Yes. And he had a claims-made policy there. He didn't think that he did anything wrong at all in this incident because what happened, and this is here also in the notice of claim, is that the patient was getting anesthesia for surgery. She sat up, said, oh, my head hurts. He let the anesthesia wear off a little bit, made sure she was okay, decided to proceed with surgery, put her back under, and everything was fine, and then he left the surgical suite and left her in charge of the nurse. And the nurse turned off the alarms on her monitors when Dr. Dinius came back into the suite, found that the patient had no pulse and that she was in distress. And so in his mind, there was nothing to report because he didn't do anything wrong. So in question 23, that's why he answers there had been no untoward anesthesia incidents in the past five years, including cardiac arrest. Right, because he did not see that he had done anything whatsoever that would have required a claim. But even so, whether or not Dinius reported or didn't report has nothing to do with whether or not Market Finders underwrote this policy. But getting back to did nothing wrong, didn't he have some supervisory responsibility over the nurse? He doesn't have a reporting responsibility for the nurse. He only has reporting. He's an anesthesiologist in charge, doesn't he have some responsibility? And he might, he certainly might, but he does not have a reporting responsibility for her. Her employer, the company ACT, had a reporting responsibility, if at all, and at the moment, the report would have been to CNA, because that was the insurance at the time. I mean, you know, I mean, he has some responsibility to make sure that her performance in the operating suite is up to snuff. He's in charge of, you know, the anesthesiology, right? But the reporting isn't what is at issue here, because what is at issue is Market Finders. That's doing something wrong if you don't properly supervise. And he didn't see it that way. Well, but the point is that somebody should have, and if they should have, and should have investigated this and done something different that would have helped your client, right, presumably. If he had reported, he would have reported to CNA at the time. No, at the time he applied. Claims made. But the record is also undisputed that Market Finders didn't review the applications. Well, that's my point. If they had figured out that this person was going to be sued, then events would have transpired differently from your client's point of view. They may have, but if Market Finders had put him into the patient compensation fund, that's the falldown that we're, that's the problem here, is they didn't see that there was a risk, even though they knew that his old policy was a claims-made policy, that he practiced in Indiana the prior year, that he was still at risk the prior year, and they didn't do anything to make sure that he was placed in the fund or to make sure the premium was paid. All they did was what the insured told them to do, which is, oh, take him off that endorsement, because he's no longer practicing in Indiana. He was still at risk for Indiana. Counsel, your time is running quickly, and I know we've taken up a lot of time, and I hope that Judge Graber will allow you sufficient time, but I would like you to turn to the causation question before you sit down. Yes. There is, obviously, Scottsdale had to pay much more than $250,000 on this claim. But Scottsdale's own internal reports assess that most of the blame goes to the nurse. They said that there was probable liability, I believe was the language for her, and I forget what the language was, but Scottsdale was on the hook for the nurse and the hospital and the doctor collectively. Yes. But this is a question for the jury. Just because the $1.3 million was paid out for all of them doesn't mean that Scottsdale wasn't damaged or there was no causation as a matter of law. It's for the jury to decide how much Scottsdale was damaged. Under what conditions would Scottsdale be damaged? If a jury would have found that the doctor was responsible for more than $250,000 of the $1.3 million? That's correct. If a jury were to find that it was less than, then there would be no causation, is that correct? Potentially, yes, potentially, but that is a jury question. This is a two-edged sword for you. Well, it's a two-edged sword at trial. But we're entitled to get to trial on that, because I mean, under Judge Toshima's theory that he was using as a question earlier, I don't know if it's just a question or it's a theory, but if he were deemed to be responsible for everything that happened, then a jury could find, you're saying, that it's the whole $1.3 million? Absolutely, absolutely, and especially because ACT was in there also, and it's responsible for its employees, for the nurses' errors also. And so nobody was placed in the fund, not ACT. ACT was not, and the doctor was not, and the nurses. The nurse is not entitled to, is she? Right, right, as far as I know. Well, first of all, most tort liability is joint and several, right? Isn't that true? In other words, you know, in that case or in Arizona? Not in Arizona, it's not. Huh? No. Not in Arizona. No. Not in Arizona? No. There's a statute that says it's all several unless the jury would, say, if that case had gone to trial, return different verdicts or apportion the verdict between the hospital, the nurse, and the doctor. That's what the jury would have done. That's a jury function in Arizona? That's a jury function. It's 12, ARS 12-2506. Which case would have been tried in Arizona? Yes. The agency agreement states. No, I don't mean that case. I mean the malpractice case. If the doctor had brought a, if a suit had been brought by the patient against the doctor and the nurse and the hospital, where would that suit have been brought? Indiana, right? I assume where she was injured. Okay. Do they have joint and several liability in Indiana? I don't know the answer to that. That's my point. In most places it's joint and several. Well, then it's still up to the jury, however, to decide whether Scott's, how much by which Scottsdale was damaged. Oh, but in most places, if the jury holds all three liable, you know, they don't separate out, apportion out the damages. Let's say 1.3 million. Then Scottsdale was damaged by 1.3 million less 250,000 cap. That should have applied. Well, so my question is, if that were subject to a joint and several type of liability, then is there causation? There is causation. And that is up to the jury to decide whether and how much. When you say up to the jury, now you're speaking of the Arizona jury. Yes. In this particular case. In our case, an Arizona jury has to decide by how much Scottsdale was damaged. Thank you. Thank you, Your Honors. Thank you. We kept you a long time with questions, and we'll restore some rebuttal time for you as well. Mr. Popham. Good morning, Your Honors. Gary Popham on behalf of the Appellee Market Finders Insurance Corporation. I'd like to start off with the duty question, and that's that there was no claim below that market finders didn't properly underwrite this policy. The claim was that market finders failed to enroll Dr. Denius or ensure that Dr. Denius was enrolled in the patient compensation fund. We've all agreed that there's no express or enumerated duty contained within the contract between Scottsdale and market finders requiring market finders or obligating market finders in any regard with respect to the Indiana patient compensation fund. The court asked a question about the application of Dr. Denius and specifically the question number 22 on the page 00302 of the record. That same question is asked within the contract material on 00305 of the application materials, and that form is called the medical incident or threat of claim form. 00305?  Go ahead. That it's question number one, and Dr. Denius responded no to that question. Right. In addition, Dr. Denius, the information that Dr. Denius provided with his application indicated that he was practicing exclusively in Ohio. The only information related to that. Oh, but that doesn't address the claims made, you know. It doesn't. It doesn't. The only information related to Indiana was that Dr. Denius was licensed in Indiana and had past practice in Indiana, but his application indicated that he had last practiced in Indiana on June of 1998, and that was a day prior to the retroactive date set for him in the policy issued by Scottsdale. The incident here occurred in April of 1999. That's correct. And there was nothing in any of the forms that would have alerted market finders to the fact that he was practicing as late as April? There was nothing in the materials submitted to market finders that Dr. Denius was practicing in India. What about the fact that market finders got lists of the doctors and where they were practicing, and one of the first lists showed Dr. Denius practicing in Indiana? Those lists didn't indicate where the doctor was practicing. Those lists indicated where the doctor was licensed. And Dr. Denius was licensed in both Indiana and Ohio. There was no information provided to market finders to indicate that Dr. Denius was practicing in Indiana in April of 1999. Well, let me ask this general question. Whose obligation is it to investigate or to make sure there's sufficient information about the claims mailed tail coverage? It's not, well ---- Is it Scottsdale's obligation to do that? I don't think it's either Scottsdale's obligation or market finder's obligation. I believe it's the insured and the broker operating on behalf of the insured's responsibility to make sure that there's coverage up to the point of the new policy. Well, but the point of the new policy, in a sense, because it's claims made, is retroactive, right? Retroactive to a date that market finders understood based on the information that it was provided, subsequent. No, but my question is, isn't somebody supposed to investigate, you know, the applicant for the insurance to find out what kind of exposure there is in that tail period? Well, in this case, there is a requirement in the underwriting guidelines that there's an investigation. Whose obligation is that? Well, it would be market finders and Scottsdale Insurance Company. And you didn't fulfill that obligation, did you? Well, we didn't. It didn't appear as though that there was information provided to market finders that would exclude, that would have any bearing on whether or not he was insurable under this policy. The underwriting guidelines ---- I mean, you didn't know he had practiced in Indiana the year before. That's right, Your Honor. Well, and that's material to the tail coverage, right? But market finders had no responsibility for tail coverage. The claims made policy was market finders' responsibility, putting that policy together and providing the information for Scottsdale Insurance Company. Well, but you did know that the previous policy was a claims made policy,  That's right. so you wouldn't necessarily have known that whatever he did, wherever he did it while he was insured by CNA, nonetheless there could be a claim made during the policy period that you were arranging for. That's right. And the policy period that we were arranging for would start from a date subsequent to a date that it was provided to market finders that Dr. Dennis was operating in Indiana. Well, but he had operated in Indiana. So what's the statute of limitations in Indiana? I believe for medical malpractice claims it would be three years, but it wouldn't be market finders' responsibility to ensure that Dr. Dennis went and purchased tail coverage for claims arising in Indiana when he's obtaining a policy to insure him for his practice in Ohio. Well, Scottsdale was still going to be on the hook for the April incident because of what the start date was for the coverage of the insurance. Well, Scottsdale would be on the hook for the April incident, regardless of whether or not Dr. Dennis was enrolled in the patient compensation. Because they're covering the hospital and the nurse. Because they're covering consultants and anesthesiologists and Nurse Boyack. Had market finders known that Dr. Dennis had practiced in Indiana during that period and had they insisted that he be covered in Indiana, how would that have changed the premium? Well, that's a good question, Your Honor. I don't know the answer to that. My understanding is that Dr. Dennis was charged a premium in excess of $5,000, and that was six times greater than the $881 premium charged to the Indiana physicians. That made it equal to his Ohio colleagues. Well, that assumes that those other two doctors were not practicing in Indiana. There was no evidence presented to the court below in response to market finders' summary judgment motion. But his premium was about the same as the other doctors in Ohio. His premium was about the same as the other doctors in Ohio. As most of them. In fact, it was less than some doctors in Ohio. But that assumes that those doctors weren't also practicing in Indiana, and we don't have that evidence. Scottsdale did not offer that evidence in response to market finders' summary judgment motion. So there was no issue of fact related to the premium. Dr. Dennis was charged a higher premium. And this is one policy. It's not that there were two policies covering acts that come out of Ohio and coming out of Indiana. There's one policy covering any losses that fit within the coverage. To both of you, and neither one of you knows the answer. It's interesting, but neither one of you has an answer to the question. And on the issue of duty with respect to enrollment in the Indiana patient compensation fund, market finders moved on summary judgment on that issue, and it was Scottsdale's responsibility to oppose the summary judgment motion with evidence to create an issue of fact, and it didn't do that. And so market finders couldn't establish that there was any duty, any expectation at all related to market finders with enrolling its insurers in the patient compensation fund. Unless there are other questions on the issue of duty. Well, yes, because I'm still thinking about the question of whose duty it was to investigate the extent of risk and the insurability in response to the applications. And it was market finders had the initial responsibility to assess the risk when writing the policy. That's what was skewed. Okay. So if some of the problem arose because of inadequate work in that regard, that could create liability on the part of your client. Well, there wasn't any claim that market finders improperly investigated the information it received when writing the policy asserted in the court below. Well, that seems to me to be part of the question of figuring out where the physician actually practices, seems in a sense, where the liability is potentially different in two states. It makes a difference to know where the person has practiced and is practicing. So why wouldn't that be part of underwriting? Well, it may be part of underwriting, but it has no bearing on whether or not market finders had a responsibility to enroll in the Indiana patient compensation fund. So if they knew that he had practiced in Indiana at a time that could create liability, and they had just decided that they, because his name started with D, they were going to include all the other Indiana physicians and not him, they could do that without any liability? Well, in this case, the market finders, well, HIS, the insurance broker, was instructed not to enroll Dr. Dennis in the patient compensation fund. Well, that doesn't really answer my question. You know, somebody had an obligation to enroll Indiana physicians in this scenario. There was, it seemed to me, a clear intention expressed from these memos back and forth about who was to be enrolled and change this one and move that one, that everyone intended that someone be responsible for getting all the Indiana physicians covered. And so I'm at a loss for us to understand how we are sitting here to decide that as a matter of law it wasn't you guys. Because there was no evidence presented below in response to market finders' summary judgment that Scottsdale Insurance Company had that expectation. The expectation with respect to enrollment in the patient compensation fund was discussed in the proposal that HIS and ACT agreed to. And that proposal suggested that only the, it said all Arizona providers or all Indiana providers would be enrolled in the patient compensation fund, but then it had an express condition that only the five Indiana physicians working in Indiana would have the reduced policy limits. It didn't identify which five physicians were to be enrolled in the patient compensation fund who were working in Indiana. And the original list of five included Dr. Denius. No, that's wrong. I thought it did. There was a new business submission that identified six physicians who were enrolled in, who were licensed in Indiana. And Dr. Denius was one of those. So you're drawing the conclusion that he was the odd man out, so to speak. I'm not, no, Your Honor. I'm telling, I'm presenting the fact that the insurer directed that Dr. Denius was not one of the five physicians who was working in Indiana and who was to be enrolled in the Indiana patient compensation fund. And even if Dr. Denius was enrolled in the patient compensation fund, there's nothing in this case, and Scottsdale didn't provide anything below in response to Market Finder's summary judgment motion that would have showed that Scottsdale's risk would have been limited to $250,000 because CIA and Nurse Bulyak, consultants in anesthesiology and Nurse Bulyak, were not enrolled in the patient compensation fund on the date of the Anita Conyers incident. Adam Crow, Scottsdale's expert, who was a former employee of the Indiana patient compensation fund, said in his opinions, which were part of the court's record, and in his deposition testimony, which was attached to the record in the court below, that in order to be eligible for the cap liability in the fund, you had to be enrolled in the fund on the day of the incident, April 9, 1999, and the day that the claim came in. And neither consultants in anesthesiology or Nurse Bulyak through consultants in anesthesiology were enrolled in the fund on the date of the incident. So they weren't entitled to protection under the fund. Those kinds of entities and persons are eligible to enroll in the fund? Yes, Your Honor. And when Market Finder ---- Including the nurse? I thought the nurse was ---- The nurse is enrolled through the entity. Okay. So the entity is enrolled or can be enrolled and the physician can be enrolled. Right. And when the enrollment happened after Market Finders wrote the Scottsdale Insurance Company policy, CIA was then enrolled in the fund. But because CIA wasn't enrolled in the fund on the date of the loss, neither CIA or Nurse Bulyak were entitled to protection under the fund. Is the rule the same for the doctors? Do the doctors have to be enrolled in the Indiana fund both on the day of the incident and on the day of the claim? According to Adam Crow. Okay. And was Dr. Denius enrolled on the day of the incident? It appears that he was, Your Honor, but ---- Okay. But he was not enrolled on the day of the claim, so that's the problem. Right. And the claim against ---- And even if he was enrolled and he had cap liability, there was a claim against CIA for vicarious liability against Dr. Denius.  Dr. Denius' cap liability if the patient took the case to trial and there was damages awarded the patient in excess of those damages. The patient compensation fund only acts as an insurance policy for those that are enrolled in the fund. So something that exceeds policy limits or the coverage protected under the fund, those that are not protected under the fund are responsible for it. So you're arguing now, you're arguing either damages or no damages or causation, right? Right. And causation, another causation argument is that there was no evidence presented below that Scottsdale Insurance Company paid anything more than $250,000 to settle Anita Conyers' claim against Dr. Denius. They paid in excess of a million dollars, but they paid for not only Dr. Denius, they paid for CIA and Nurse Bolyak. How could we determine that at this point, though, as to what would be the ---- Well, that's the problem. You can't, because Scottsdale didn't respond to Mark and Finder's summary judgment motion with any evidence to allow any of us to determine that. And that's what it was obligated to do. Well, how could anybody except for a jury decide that question? That is uniquely a jury question. It's not a question of law. And here's the problem. The underlying case was settled, so there's no jury to decide that question. That question can no longer be decided before a jury. But even a proportion of liability question is a jury question. So how could they possibly do that? Establish a dummy jury and then pull them and then present that to the district? Well, arguably, and I borrow from legal malpractice cases, you could presumably have the case within the case and also try the medical malpractice case. But there was none of that type of evidence produced below in response to the Mark and Finder's summary judgment motion to suggest that there was even any question of fact that Scottsdale paid any more than $250,000 to settle a claim against Dr. Denny's. Counsel, you have exceeded your time. I did. And I just ask that the district court's ruling be affirmed. Thank you, Your Honor. And you also did, but we'll give you a couple of minutes for rebuttal since we took much of your time with questions. Thank you, Your Honor. I don't think I'll need that much time. I just want to make a couple of points. First, when counsel says that there's evidence in the record that the company, CIA, and the nurse were not enrolled in the fund at the time of the incident, it's not exactly true. There is a question of fact on that issue for this reason. In the supplemental excerpt of record, page 299, it says that CIA was not covered before August 99, but Dr. Denny's worked for ACT, A-C-T. The names and the entities changed in there, and there's not evidence. There's a question of fact as to whether the fact that CIA wasn't covered also means that A-C-T, ACT, wasn't covered. That is not conclusive in the evidence. Also, ER-64 states that the nurse was not enrolled for the current year, and that was in September of 99. Now, the policy year went from August 99 forward. So that doesn't state conclusively that she was not covered for the prior year. So there's definitely an inconsistency in the facts, in the evidence, as to whether or not there was coverage for the prior year. Second, the question was whether there was any information that market finders knew Dr. Denny's was practicing in Indiana. Well, the real question is whether they knew he was at risk for his prior conduct in Indiana, and they definitely knew that because his application showed that his prior policy was a claims-made policy under CNA. And so, yes, they had the obligation to determine whether he had tail coverage under CNA because Scottsdale, based upon market finders I asked Ms. Parham that question as to whose responsibility is it to find that out. And I'm saying because market finders knew his prior policy was a claims-made policy, and because they accepted the risk of prior conduct for Scottsdale, it was their obligation to determine what that risk was. Was there tail coverage or wasn't there tail coverage? That is what underwriters do. You mean that's just one of the ordinary duties of an underwriter? Yes, because that's the risk. They're talking about ensuring the risk and how much risk is there and how much should it cost. That's their obligation. There is an issue of fact on the premium because by the fact that Endorsement 5 and Endorsement 13 were issued the exact same day. 5 has the amount of the premium, and 13 shows that Dinius was on the list of Indiana practitioners subject to the lower cost. So we think the record clearly shows that the higher premium was for his Ohio risk, but at a minimum it's an issue for the jury. Finally, the evidence that market finders was expected to ensure the Indiana practitioners' enrollment in the policy, Dinius was listed as an Indiana practitioner on the solicitation, and the proposal said that all Indiana providers will be enrolled. That was subsumed within the premium. It was the proposal. That was what was expected. It was what market finders expected, and they didn't follow up. Thank you, counsel. Thank you, Your Honor. We appreciate helpful arguments in this somewhat complicated case from both parties. The case is submitted.
judges: Tashima, Graber, Bybee